ORDER
STACY L. LEEDS, Associate Justice.
This cause of action, from its administrative inception, has been plagued by substantial delays, at all levels. The case presents several issues of first impression for this Court including the scope and applicability of Cherokee TERO laws and the extent to which this Court may review administrative decisions of the TERO Committee.
*27 Procedural History
Petitioner filed this cause of action in August 1999 appealing a “Final Order” of the TERO Committee dated 7/13/99, On August 11,2000, a trial on the merits was held with then-Chief Justice Viles presiding and Justice Dowty, present. The third position on the JAT was vacant at the time.
On August 25, 2002, the case, having not yet been resolved, was re-assigned to Justice Leeds pursuant to JAT Rule 3(a). Shortly after re-assignment a status conference was held in which the parties appeared, by and through their attorneys, Thomas Baker for the Petitioner Sanders and Linda Donelson for the Respondent Cherokee Nation. The parties requested a final resolution on the question of liability. Both parties stipulated to a ruling by Justice Leeds on the record before the Court. It was also agreed that the issue of remedies, if applicable, would be addressed separately following a decision on liability.
At the time of the status conference, Justice Leeds estimated a written decision would be issued by September 27,2002. Once review was underway the complexities of legal issues and sheer volume of testimony and exhibits required the Court take additional time in exercise of caution and deliberation over expediency. The parties’ patience in this matter is appreciated.[1]
Factual Summary
Petitioner Sanders is a tribal member and certified TERO vendor. In 1998, Petitioner repeatedly expressed his interest in submitting a bid to provide products for a Diabetic Grant Program (DGP). The Cherokee Nation participated in the DGP as a result of an Indian Health Service Grant.
Petitioner sponsored various meetings with tribal employees and officials throughout 1998 for the purpose of demonstrating certain products he sought to provide for the DGP. Assuming the competitive process was active and available to him as a TERO vendor, he sponsored a final meeting in December 1998 as a means of onee again manifesting his intent to compete for the DGP contract. He offered a culturally unique program in which his products would, to the exclusion of other vendors, include instructions for Cherokee speakers. Some time after the December presentation, he discovered that the DGP contract had been awarded to another supplier. In fact, the DGP had already been awarded to another vendor at the time of his final presentation. It is undisputed that Petitioner did not get an opportunity to submit a bid for the DGP despite his TERO vendor status and despite countless efforts to be involved in the competitive bidding process.
Following his exclusion from the bidding process, Petitioner initiated a complaint to the TERO Committee alleging that he had been intentionally and wrongfully excluded from the bidding process on contracts for medical equipment and supplies needed by the Cherokee Nation under the DGP.
Petitioner’s treatment before and during the administrative process was deplorable, at best. Through innumerable attempts to resolve his complaint, Petitioner was denied a final ruling or response, denied *28 access to adequate hearing for lack of quorum, and at times, mislead. Initially, he was told he was denied the bid because his products were more expensive than those selected, yet his “alleged” bid could never produced.
In several administrative hearings, both formal and informal, it does not appear from the record that the TERO Committee ever made a “decision” on his complaints with the exception of an informal decision indicating only that “there was no deliberate intent to circumvent Cherokee Nation TERO regulations”. (March 2, 1999). Rather, after numerous hearings, and after much expenditure of Petitioner’s time and resources, it appears that the TERO Committee simply gave up, never making a determination on whether Cherokee TERO laws or federal laws applied or had been violated. The TERO Committee, rather than making a decision on liability, played a passive role and apparently concluded the parties’ inability to reach a settlement agreement was sufficient grounds for sending this case to the JAT.
There was never a TERO Committee determination on (1) whether or not Cherokee TERO laws apply to the Cherokee Nation as an “employer”; (2) whether or not Cherokee TERO laws or other federal laws applied in the award of the DGP to require competitive bidding; (3) whether Petitioner was injured as a result from being improperly excluded from the bidding process; or (4) whether Petitioner is entitled to any action of the TERO Committee or other available remedies. The lack of resolution at the administrative level complicates this Court’s review process. The Court has no choice but to engage in de novo[2] review in order to provide a decision the TERO Committee was either unable or unwilling to reach.
Conclusions of Law
I. The Nature of the Appeal and Standard of Review
The "Final Order” which is the basis of this appeal was entered July 13, 1999 and is attached. The “Final Order” states that Sanders “is not satisfied with the performance of the Cherokee Nation with respect to the Purported Settlement Agreement and requests leave to file suit.” The only administrative “order” or “finding” of the “Committee” is that Sanders “has exhausted his administrative remedies and is entitled to litigate his complaint.” The “Final Order” is signed by Don Greenfeather, in his capacity as “Chairman of the Hearing Committee,” an entity not mentioned in the TERO statutory scheme. The reason the “Final Order” was issued by the “Hearing Committee,” it appears from the record is that there was never a quorum of the “Cherokee Nation Employment Rights Committee” as contemplated in the statute. 40 C.N.C.A. § 11. Petitioner repeatedly attempted to seek due process and a fair hearing before the TERO Committee, but never received one.
The “Final Order” is of utmost importance because, although Sanders’ petition in this case references several “adverse decisions” of TERO and the Tribal Council, the petitioner is more specific in Paragraph II when it states that his appeal is from an adverse ruling denominated “Final Order” and signed “7/13/99.”
The relief sought in the complaint requests this Court (1) accept this appeal on Petitioner’s TERO Complaint; (2) reverse the Final Order entered by the Council and TERO Committee; (3) award fees and *29 damages; (4) reverse the unilateral giving of the Diabetic Grant Program to Bayer.
Items three and four are remedial measures that at the agreement of the parties, would be briefed separately following a favorable ruling for the Petitioner on the issue of liability. Items one and two present the legal issues to be resolved by the Court.
The Court has granted Petitioner’s first request by accepting this appeal and addressing the legal and factual issues. Despite the technical irregularities presented by the habitual lack of quorum of the TERO Committee, Petitioner is entitled to a forum to present his claims and to the extent that the both parties and the “Hearing Committee” deem Petitioner’s administrative remedies exhausted, this Court will concur, but only out of concern that Petitioner be afforded adequate due process.
Item two presents the most confusion to the Court and necessitates the Court’s detailed explanation of the “Nature of the Appeal” in this subsection. Petitioner expressly seeks a reversal of the Final Order, but to grant this request would be to reverse Petitioner’s entitlement to bring the suit as the only thing “decreed” in the “Final Order” is that Petitioner’s administrative remedies were exhausted. Perhaps the Court could state that the Nation’s performance with respect to the Settlement Agreement was not in good faith, but “purported” agreements are just that, purported. This Court is without authority to enforce a settlement agreement that was never finalized and approved by both parties.
However, there were TERO “decisions,” in plurality, and they form a litany of honest efforts by a TERO-certified vendor to do business with the Cherokee Nation to provide supplies in a business-like manner.
The Court must review the record to determine what laws were in effect at the time Petitioner Sanders’ complaint arose and whether those laws were followed by all parties bound by those laws. In doing so, the Court treats the appeal, not just an appeal of the so-called “decision” of the “TERO Committee” set forth in the “Final Order” but as an appeal of the several decisions (or inactivity) of the “TERO Committee” throughout Sanders’ TERO Complaint.
This appeal, given its due process implications is an anomaly. This decision is not intended to set a precedent whereby the TERO Committee or any other administrative agency can shirk its duties and delegated responsibilities by simply declaring remedies exhausted in order to have the JAT entertain the decisions that should have been addressed below.
2. Respondents’ Motion for Summary Judgment,
At the time of the trial, Respondents’ pending Motion for Summary Judgment had not been ruled upon. In a Minute Order dated 8/07/00, Chief Justice Viles indicated that, absent a prior ruling, the Motion would be heard on the morning of the trial, August 11, 2000. Since no formal decision has been issued on the Motion, the Court must first address the issues presented in the Motion, many of which are also presented in the trial briefs as issued to be resolved on the merits.
The issues presented in Respondents’ Motion for Summary Judgment follow:
(1) whether this . .Court lacks subject matter jurisdiction
(2) whether Petitioner has standing to bring this cause of action
*30 (3) whether sovereign immunity bars this suit.
Although Respondent did not object to jurisdiction in the earlier stages of this litigation, the issues raised by Respondent are nonetheless timely insofar as it challenges this Court’s jurisdiction. Rule 20 Motions under the JAT Rules and Procedures encompass challenges to this Court’s jurisdiction and may be brought “any time prior to any hearing and/or trial.” Rule 20, JAT Rules. Rule 20 is similar to its counterpart. Rule 12(b)(1) of the Federal Rules of Civil Procedure governing jurisdictional objections. Rule 20, like FRCP 12(b)(1), can be raised at any time, by any party, or by the Court itself. Federal courts permit 12(b)(1) challenges even aftpr cases have been decided.
Although it would have certainly expedited the case if this Court would have addressed the jurisdictional challenges earlier, Rule 20 permits challenges to personal and subject matter jurisdiction even up to the time of trial, so long as permitting by scheduling order.
The Court’s inquiry must necessarily address the procedural issues presented in the Motion first. Incidentally, the issues raised in the Motion involve a similar inquiry as those raised in the issue of liability. Both the procedural and the substantive issues turn on the following questions:
(1) whether the Cherokee TERO laws apply to the Cherokee Nation; and
(2) whether various federal laws apply to the Cherokee Nation within the context of the DGP.
The procedural challenges raised by Respondent include the interrelated and often intersecting principles of standing, sovereign immunity and subject matter jurisdiction. These issues are easily confused and often intermingled when they should be treated separately. In order to clarify the issues, the Court will address each independently, beginning with standing and progressing to sovereign immunity and subject matter jurisdiction, respectively.
A. Standing
Standing is a legal doctrine which assesses a Petitioner’s right to file suit or bring a complaint, in a specific circumstance. In this case, Respondent argues that Petitioner lacks standing because “Petitioner is not a real party in interest” pursuant to either the U.S. or Cherokee Constitutions. In order to have standing, a Petitioner must demonstrate that there is an actual controversy and that either a statute or the Constitution gives jurisdiction to the JAT.
The precise issue of standing, like the interpretation of subject matter under § 62 must be treated independent from issues of sovereign immunity and subject matter jurisdiction, which is discussed below. At the same time, standing necessarily implicates sovereign immunity and jurisdiction to determine whether the Petitioner should be able to sue in the current circumstance.
Respondent argues that Petitioner lacks standing to bring the cause of action in reliance on Mayes v. Thompson, JAT-95-15 (1996). Petitioner, unlike the Mayes scenario, relies on a specific statute, 40 C.N.C.A. § 62, for the basis of his standing to bring suit:
Any party to a hearing shall have the right to appeal any decision of the committee to the Judicial Appeals Tribunal of the Cherokee Nation of Oklahoma pursuant to the tribal Constitution.
Petitioner initially brought his complaint before the TERO Committee and is now appealing the “Final Order,” This cause of action, including Petitioner’s standing to bring suit, as a “party to a hearing,” is *31 contemplated and sanctioned by 40 C.N.C.A. § 62.
Respondent argues that Petitioner has failed to allege an injury-in-faet to meet the standing requirement. The Court disagrees. Petitioner alleges that he has suffered harm on many levels. He alleges that as result of certain TERO law violations, he has been denied certain business opportunities afforded him as a certified TERO vender. He also alleges he has been injured by the expenditure of funds and other energies on meetings to present products to the Cherokee Nation after he had already been a improperly excluded from the bidding process.
This case, if prohibited by Title 40, is not prohibited on the basis that § 62 fails to grant general jurisdiction to the JAT to hear appeals of TERO decisions. To the contrary, Section 62 expressly provides a general grant of subject matter jurisdiction to the JAT to hear administrative TERO appeals.
Section 62 clearly recognizes claims brought by individuals or Indian-owned businesses for violations of Indian preference in contracting or other alleged TERO violations. Section 62 expressly provides a general grant of subject matter jurisdiction to address these types of appeals.
As discussed in the following sections, this case is prohibited because nothing in Title 40 expressly permits the Cherokee Nation to be sued or otherwise subjected to claims or penalties. Had the defendant been an “employer” as defined in 40 C.N.C.A. § 3(H) or elsewhere Title 40, the issue of standing would have differed significantly. Here, sovereign immunity intersects to defeat standing. Had the Defendant been an “employer” under Title 40, one in Petitioner’s situation would have standing bring suit.
B. Sovereign Immunity
 Although standing and sovereign immunity intersect, they must be addressed separately. The doctrine of sovereign immunity, despite its origins as an English common law shield to preclude claims against the King, has long been extended to bar to suits against the Cherokee Nation and other sovereigns. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The Cherokee Nation has the authority to waive its own sovereign immunity. For purposes of TERO complaints, Title 40 offers the only possible source for that waiver. 40 C.N.C.A § 62, as previously noted, generally ext ends jurisdiction to the JAT to hear appeals of TERO decisions. Section 62, however, is silent as to whether the Cherokee Nation could be a defendant in a TERO Committee complaint. To answer that question, it is necessary to examine what type of complaints can be brought before the TERO Committee in the first instance, to see if a waiver of sovereign immunity can be found to permit suits by an individual against the Cherokee Nation. If the Cherokee Nation could not be the subject of a TERO complaint, under Title 40, then the JAT would also lack authority to hear suit.
There are three statutory provisions that provide for filing of complaints with the TERO Committee. 40 C.N.C.A. § 51 permits the Committee to file a complaint on its own behalf for failures of an “employer, contractor, sub-contractor, or union” to comply with TERO law, rules, regulations or orders of the TERO Committee. 40 C.N.C.A § 52 permits individual Indians to bring complaints to the TERO Committee when they believe “an employer” has failed : to comply with TERO laws or has otherwise discriminated against them because they are Indian. 40 C.N.C.A. § 53 provides for an era- *32 ployer or union to file a complaint with the TERO Committee.
In the first instance, § 51, the complaint is filed by the TERO Committee. This is not the provision at issue in this instance because Petitioner Sanders and not the TERO Committee was the initiator of the TERO complaint.
In the third instance, § 53, the moving party must be an “employer or union.” It has not been suggested that Petitioner Sanders is an “employer” who could bring action arguing illegality or error in the application of TERO law, regulations or Committee orders. Instead, he is a TERO-vendor who was denied the opportunity to bid for a contract with the Cherokee Nation.
It is the second instances that holds the greatest possibility for the case at hand. In the second instance, § 52, the complaint is filed by “any Indian” who believes an “employer” has failed to comply with TERO laws, rules and regulations. Since Petitioner Sanders is a tribal member, this Section could arguably authorize his complaint to the TERO Committee provided the complaint was against “an employer.” The term “employer” is statutorily defined as:
any person, company, contractor, subcontractor, or other entity located or engaged in work with the Cherokee Nation, employing two or more persons. The term “employer” excludes federal, state, and county governmental agencies, but includes agencies, contractors, and subcontractors of all other agencies.
40 C.N.C.A. § 3(H). Petitioner Sanders’ complaint, at the administrative level as well as in the JAT, alleges that the TERO laws and regulations were not followed by the Cherokee Nation regarding an Indian Health Service grant. The question then arises, for the purpose of the sovereign immunity inquiry as well as the substantive liability issues, whether the Cherokee Nation constitutes an “employer” under the statutory definition. If the Cherokee Nation is not an “employer” and there is no other subsection that permits a TERO vendor or tribal member to bring a TERO complaint against the Cherokee Nation, then the complaint would be barred by sovereign immunity.
In order to be considered an “employer” under the statutory definition, the Cherokee Nation must fall under one of the following classifications: “person, company, contractor, subcontractor or other entity.” It could be reasonably be argued that the Cherokee Nation is either a “contractor” or “other entity” for purposes of § 3(H); however, the next sentence of the statute creates more substantive ambiguity. There appears to be a missing word or words in the statutory definition that creates a substantial obstacle for this Court’s interpretation.
It is unclear whether the entity MUST be “engaged in work with the Cherokee Nation” to constitute an “employer” under § 3(H). To clarify, the statute uses the word “or” instead of “and” immediately preceding the phrase “engaged in work with the Cherokee Nation.” It unclear from the plain language of the statute whether the definition “employer” would include entities that are simply located within the Cherokee Nation or on tribal lands or whether that entity must also be “engaged in business with the Cherokee Nation.” It is likely that the phrase “engaged in business with the Cherokee Nation” was intended to make TERO laws applicable to all entities, that despite their physical location outside the territorial jurisdiction of the Cherokee Nation, are bound by TERO laws by virtual of their consensual business dealings with the Cherokee Nation. But, what of entities *33 that are physically “located” in the Cherokee Nation or on tribal land, yet are not “engaged in business ‘With the Cherokee Nation?’ ” Do the TERO laws apply to those “entities” by virtue of their “location” alone, even if they are not engaged in business with the Cherokee Nation?
The inquiry, although framing the issue slightly broader than the present instance, is a very important one. If Cherokee TERO laws apply to all persons, employers, contractors, subcontractors, and “other entities” by virtue of their location alone as a separate issue from their business dealing with the Cherokee Nation, then the Cherokee TERO laws arguably apply to the Cherokee Nation itself. But, if it is required that an entity be “engaged in work with the Cherokee Nation” then the TERO laws cannot apply to the Cherokee Nation, for it is impossible for the Cherokee Nation to be “engaged in work” with itself.
Looking at the plain language of § 3(H) the question cannot be adequately resolved. It appears that at least one oversight might have occurred in the drafting of the statute because, in the present state, it leads to much confusion. It appears the word “in” might have been left out immediately following “located,” which would read:
“Employer” shall mean any person, company, contractor, subcontractor or other entity located in or engaged in work with the Cherokee Nation ...,
Or, perhaps the word “with” should have been drafted as “within,” reading:
“Employer” shall mean any person, company, contractor, subcontractor or other entity located in or engaged in work within the Cherokee Nation ...
Both possibilities would clarify the existing language to contemplate the Cherokee Nation as a possible “contractor” or “other entity” subject to TERO laws, but this Court is merely an interpreter of the law as it is presently drafted. This Court cannot exceed its powers by speculating what the Council might have intended particularly when it comes to questions of sovereign immunity. There is simply no definitive expression that the Council meant to include Cherokee Nation into either of the categories set forth in § 3(H). Likewise, there is no expression of the Council’s intent to include the Cherokee Nation or any other entity in the TERO scheme by virtue of its location alone. “Business dealings” with the Cherokee Nation seems to be a requirement for application of TERO laws.
The two ambiguities in statutory language require more inquiry, if not future legislative clarification: (1) was the Cherokee Nation intended to be included in the “other entities” classification under § 3(H); and (2) is it necessary that an entity by doing business with the Cherokee Nation in order to be bound by TERO laws and regulations?
40 C.N.C.A. § 2 sets forth the purpose of Title 40, shedding some light as to the second ambiguity. Section 2 states the purposes of the legislation as focusing on the promotion of fair employment practices and the prevention of discrimination at the hands of “employers who are doing business with the Cherokee Nation on tribal lands.” Nothing in the purpose statement suggests a scheme to regulate employment within the Cherokee Nation itself, its agencies or entities. And on a point of further clarification, the language that targets “employers who are doing business with the Cherokee Nation” necessarily excludes applicability to the Cherokee Nation. As stated above, the Cherokee Nation cannot be an employer doing business with itself. As such, this Court finds that no language in 40 C.N.C.A. *34 § 51-53, the provisions providing for the filing of complaints with the TERO Committee, constitute an express waiver of sovereign immunity.
C. Subject Matter Jurisdiction Pursuant to C.N.C.A. § 40
Respondent also argues that this Court lacks subject matter jurisdiction in this matter because this cause of action “does not fall within the rights granted to tribal members” either by statute or the Cherokee Constitution. Respondent argues that nothing in Title 40 of the C.N.C.A. “provides a cause of action to a would-be contractor against the Cherokee Nation for failure to receive a contract.” Respondent further argues that Title 40 does not apply to the Cherokee Nation because it is a labor law which is limited in applicability to employers doing business with the Cherokee Nation. Although Respondent might be correct in its final conclusions, the Court will distinguish general pronouncements of subject matter jurisdiction from the issues of standing and sovereign immunity.
The Court must again, first resolve the precise issue of 40 C.N.C.A. § 62’s grant of jurisdiction. The initial question of subject matter jurisdiction in this instance concerns whether the JAT has jurisdiction to hear -appeals of decisions from the TERO Committee, or. in this case, review a “Final Order” of the “TERO Committee.” Petitioner invokes this Court’s jurisdiction to review a “final order” of the TERO Committee pursuant to 40 C.N.C.A. § 62, which reads:
Any party, to a hearing shall have the right to appeal any decision of the committee to the Judicial Appeals Tribunal of the Cherokee Nation of Oklahoma pursuant to the tribal Constitution.
A plain language reading of § 62 broadly provides the Petitioner the right to appeal the decisions of the TERO Committee to the JAT. No further legislative instructions are provided to assist the Court in its review. In fact, the plain language grants judicial review to an extent beyond what is typically permitted in review of administrative functions. The Court, in most instances, receives instructions from the Council stating (1) the specific types of administrative decisions that can be reviewed; (2) specifically what parties are entitled to seek judicial review; (3) what standard of review the Court should apply; and (4) what remedies the Court can prescribe, if any.
Typically, this Court’s jurisdiction is limited to review of “final” administrative decisions after there has been an exhaustion of remedies at the Committee, Commission or agency level. For instance, in review of Gaming Commission decisions, the Council instructs: “The Judicial Appeals Tribunal shall have exclusive jurisdiction to hear appeals from final decisions of the Commission.” (emphasis added) 4 C.N.C.A. § 19. Likewise, in providing for review of decisions of the Employee Appeals Board, the Council requires exhaustion of administrative remedies. 51 C.N.C.A § 1025. And, as a final example, only appeals from “final” decisions of the Tax Commission are to be reviewed in the District Court of the Cherokee Nation. 68 C.N.C.A. § 19. It appears from the administrative proceedings that the parties uniformly assumed that exhaustion of remedies was required, as noted in the Final Order. However, the statute is broad enough to encompass a more expansive reading which allowed the Court to address the plurality of TERO Committee decisions rather than limited the focus simply to the language of the “Final Order.” (See “Nature of Appeal,” supra).
*35 Legislation permitting the courts to review decisions of agencies, commission, or committees typically set forth the appropriate standard of review as a means of limiting or defining the Court’s inquiry. In that light, the District Court is limited in Tax Commission appeals to give deference to administrative expertise. The legislature limits the court’s ability to take action to situations when the Tax Commission’s actions are deemed arbitrary and capricious. 68 C.N.C.A. § 19(b). In review of Gaming Commission decision, the JAT is also legislatively bound by the arbitrary and capricious standard. 4 C.N.C.A. § 19(c).
Conversely, 40 C.N.CA. § 62, which provides for judicial review of TERO Committee decisions, broadly grants an appeal to the JAT of “any decision of the committee” by “any party to a hearing.” (emphasis added). There is no mandatory exhaustion of remedies embodied in the statute and the Court is given instruction for an appropriate standard of review. In this light, judicial review of TERO Committee decision, as provided for in present statutory language, appears to be the broadest grant of judicial review of administrative decisions found in the Cherokee Nation Code.
One possible limitation on the right of appeal from TERO Committee decisions that might be inferred from the language of § 62 is the final phrase “pursuant to the tribal Constitution.” Respondent argues that this language is qualifying and should serve to limit Petitioner’s right Of appeal to actions that otherwise fall within the Constitution, such as disputes over constitutional provisions, legislative enactments, registration or employee rights. Specifically, Respondent would require an independent entitlement under -Article II “Rill of Rights” or 20 C.N.C.A. § 51 in order for Petitioner to properly invoke JAT jurisdiction. Respondent, does, however, concede that there would be a right of action if it was held Title 40 or any other statute granted the JAT the jurisdiction to hear the matter. (Respondent’s Motion for Summary Judgment, at 5.)
This Court finds that the plain language of § 62 provides for a broad grant of jurisdiction to the JAT to hear appeals from decisions of the TERO Committee. The grant of jurisdiction to the JAT dictates that “Any party to a hearing shall have the right to appeal any decision of the committee to the Judicial Appeals Tribunal of the Cherokee Nation of Oklahoma pursuant to the tribal Constitution.” The Court does not find the phrase “pursuant to the tribal Constitution” as diminishing the right of appeal created by the legislative branch in § 62. If the language “pursuant to the tribal Constitution,” is read to also require an independent entitlement under the Constitution in order to appeal to the JAT, the very purpose of the § 62 would be defeated.
The phrase “pursuant to the tribal Constitution,” absent adequate legislative history, could be interpreted in a number of ways and therefore presents ambiguity. Where such ambiguity is present, the Court must decide what was most reasonably intended by the legislature in passing this particular section.
In Title 40, the Council created an administrative agency, the TERO Committee. 40 C.N.C.A. § 11. The Council gave the TERO Committee discretion to “administer the employment rights program.” 40 C.N.C.A. § 12. The TERO Committee was also given, among other powers, the authority to adopt its own rules, regulations, and policies. 40 C.N.C.A. § 14. The Council then set up an internal dispute resolution mechanism whereby the TERO Committee would resolve violations of TERO laws. The TERO Committee *36 was also designated to provide a forum for “any Indian” that believes they have been discriminated against as a result of a TERO violation. 40 C.N.C.A. § 51-55. This dispute resolution mechanism involves informal settlements and formal hearing in which evidence can be presented to the TERO Committee. The TERO Committee is also empowered to assess penalties for violations of TERO laws, rules and regulations. 40 C.N.C.A. § 61. The Council, by including § 62 JAT review, manifested an intent that the TERO Committee should not be an administrative body of last resort. The Council apparently intended that the JAT should review decision of the TERO Committee and that the JAT’s decision, not the TERO Committee’s decision, should be the final decision. It is doubtful, reading § 62 together with other sections within Title 40 establishing a mechanism for dispute resolution, that the Council intended the phrase “pursuant to the tribal Constitution” to limit judicial review to the extent Respondent suggests. The Court therefore finds that 40 C.N.C.A. § 62 grants the JAT general jurisdiction to review the decisions of the TERO Committee. However, in this instance, because the complaint is against the Cherokee Nation, sovereign immunity bars the suit.
3. Merits of Liability Issue
A. Cherokee TERO Law
Although dicta in light of what precedes, a reading of Title 40 in its entirety further resolves the issue of whether the Cherokee Nation is bound by TERO law. 40 C.N.C.A. § 61 lists the penalties that might be assessed by the TERO Committee for violations of TERO laws, rules, regulations and orders. Again, the entities that can be bound by the penalties are limited to “employers” similar to the § 3(H) definition. The penalties that could likely be assessed by the TERO committee for violations of law do not suggest that Cherokee Nation would be an entity subject to such penalties. Penalties include denial of right to continue business within the Cherokee Nation jurisdiction, suspension of operations, money damages, civil penalties, removal of employees hired in violation of TERO laws, and orders requiring changes in policy. Each of these penalties appears to target entities that are doing business with the Cherokee Nation, or otherwise conducting business within the Cherokee Nation’s jurisdiction. With the exception a penalty requiring a change of policies, these penalties in their entirety do not suggest that the TERO Committee could levy its penalties against the Cherokee Nation itself. The TERO Committee could not suspend the operations of the Cherokee Nation, and the TERO Committee could not deny the Cherokee Nation the right to do business within the Cherokee Nation. Nor, without conflicting with constitutionally guaranteed employee rights, could the TERO Committee independently remove employees that were hired in violation of TERO laws. These type of penalties are clearly aimed toward companies that have business dealings with the Cherokee Nation.
B. Federal Laws
Petitioner argues that various federal Indian preference laws also apply to the Cherokee Nation in this instance. However, the federal laws suffer from the same lack of clarity as do the Cherokee laws when it comes to their applicability to the Cherokee Nation and to the issue of sovereign immunity.
Specifically, the Buy Indian Act, 25 U.S.C § 47, lacks binding enforceability. Originally enacted in 1908, the “Buy Indian Act” promotes Indian economic self sufficiency by providing a preference for *37 Indian-owned businesses to earn federal government contracts providing products and services in Indian Country.
Many tribes have chosen to enact similar preferential consideration in the awarding of tribal contracts for products and services because the Buy Indian Act is not binding on the internal operations of tribal governments. For instance, the Confederated Tribes of the Colville Reservation expressly requires the tribal government to use Indian preference in contracting. The Colville statute states that Indian prefer-eneing is required by “all agencies and instrumentalities of the tribe,” Colville Law & Order Code, § 10-31. Cherokee Nation has yet to enact a statute with the requisite clarity to bind the tribal government.
The United States Congress did, in fact, pass an amended Indian Preference Act of 1990, in late October 1990. The Act clarified many things, including extending its applicability to tribes, but President Bush vetoed the bill and it never became law.
The impetus for proposed amendments to the old Buy Indian laws came from the Indian contracting community and its frustrations, similar to those of the Petitioner that regulations were not being followed. These proposed amendments would have clarified that its provisions apply to any Indian tribe, including the Cherokee Nation. But, as the law stands today, all that is required is that the tribes grant Indian preference “where practicable.” There is no mandatory language, and more importantly, there is no waiver of the Cherokee Nation’s sovereign immunity to suit.
C. Cherokee Nation Policy
The trial on the merits conclusively established an important matter with respect to Indian preference in contracting: many of the employees of the Cherokee Nation and many of its officers believe that the Cherokee Nation must give Indian preference to its TERO venders and that TERO venders should get to bid on all contracts. While this might have been the policy of the Cherokee Nation in the past, and while it might be the prevailing policy at this time, the policy with respect to this case, is just that—a good policy. However, policies are not, on their own, enforceable. It is not the internal acquisition policies or administrative policies that dictate when the Cherokee Nation may be sued for violations. The Cherokee Nation Tribal Council must make the determination of when the Cherokee Nation is bound by particular laws, and when the Cherokee Nation may be sued for violations of those laws. To date, the Tribal Council has made no clear pronouncement binding the Cherokee Nation to TERO laws.
Summary of Decision
The Court is not permitted to imply waivers of sovereign immunity. Only when it is express and clear from a statute will the Court find that the Council intended to permit a complaint to be brought against the Cherokee Nation. Title 40 contains no express provisions that permit a TERO complaint to be brought against the Cherokee Nation. Title 40 contains no express provision requiring the Cherokee Nation to abide by TERO laws. Further, there are no federal laws enforceable against the Cherokee Nation in this matter.
Although this Court, like many of the witnesses that testified before it, is deeply troubled by the treatment Petitioner Sanders received in the bidding process, subsequent negotiations and in the hearings where quorums of Tribal Council members of the JERG Committee could not be produced, the Court cannot indulge its sympathies:: ■
*38 The Cherokee Nation, like governments elsewhere, has adopted commendable labor laws that serve valuable purposes, and then exempted itself from their operation in the same statute. This Court must defer to the Tribal Council and find that Title 40 doesn’t apply to, nor waive the sovereign immunity of, the Cherokee Nation.
IT IS SO ORDERED this 4th day of December, 2002.
Concur: DARRELL DOWTY, Chief Justice and DA REEL R. MATLOCK, JR, Justice
Attachment “A”

FINAL ORDER

NOW on this 13th day of July, 1999, the above matter comes on for review of the Settlement Agreement reached May 11, 1999. Tribal member Scott Sanders appears with his attorney, Thomas EBaker. The Cherokee Nation appears with its attorney, Linda Donelson.
The complainant announces that he is not satisfied with the performance of the Cherokee Nation with respect to the purported Settlement Agreement and requests leave to file suit.
EOR OOOD CAESE SHOWN, this panel finds, orders, and decrees that Scott Sanders d/b/a 5S Medical, Inc, has exhausted his administrative remedies and is entitled to litigate his complaint.
IT IS SO ORDERED,

. As this decision was being completed, Petitioner filed a “Request lor Decision” dated November 26, 2002. In the Request, Petitioner raised concerns over expediency and states that he has “since learned that Justice Viles did prepare and submit a proposed decision, but it has not yet been published.” Request, p. 2. No final decision was ever filed by Justice Viles in this matter prior to. the August 15th, 2002 swearing in of Justice Leeds.

. De novo review is not the typical standard for reviewing administrative decisions. Rather than reviewing the entire case anew, Courts routinely afford a level of deference to agencies in recognition of administrative function and expertise.